883 P.2d 38

**Jeanette DAWES, Individually and as Special Administrator of the Estate of Elizabeth Jean Bockhorn, Deceased, Plaintiff–Appellant,**

v.

**FIRST INSURANCE COMPANY OF HAWAI'I, LIMITED, a Hawai'i corporation, Defendant–Appellee.**

No. 15457.

Supreme Court of Hawai'i.

Oct. 12, 1994.

Reconsideration Denied Nov. 1, 1994.

118

Ian L. Mattoch (Roger I. Hoffman with him on the briefs), Honolulu, for plaintiff-appellant Jeanette Dawes.

Bradford F.K. Bliss of Lyons, Brandt, Cook & Hiramatsu, Honolulu, for defendant-appellee First Ins. Co. of Hawai'i, Ltd.

Before MOON, C.J., KLEIN, LEVINSON and NAKAYAMA, JJ., and WALTER M. HEEN, Intermediate Court of Appeals Judge, in place of RAMIL, J., Recused.

LEVINSON, Justice.

This case calls upon us to revisit *National Union Fire Ins. Co. v. Olson*, 69 Haw. 559, 751 P.2d 666 (1988), in order to clarify further the nature and scope of uninsured motorist (UM) insurance coverage under applicable Hawaiʻi law. The plaintiff-appellant Jeanette Dawes, individually and as special administrator of the estate of her daughter, Elizabeth Jean Bockhorn, deceased, has appealed from the circuit court's order granting the motion for summary judgment of the defendant-appellee First Insurance Company of Hawaii, Limited (FICH) and denying Dawes's cross-motion for summary judgment (order). For the reasons set forth in this opinion, we reverse the circuit court's order and remand for the entry of summary judgment in favor of Dawes.

## I. *BACKGROUND*

The facts material to the present appeal are not in dispute. On October 21, 1988, Eric L. Shimp, Bockhorn, and two of their mutual female friends spent the afternoon sand boarding and taking in the sun at Kua Bay Beach, north of the Kona Airport on the island of Hawaiʻi. Deposition of Eric Shimp (Shimp deposition), conducted on April 21, 1989, at 8–9. Shimp had driven the group to the beach in an International Travel All (the insured vehicle), a "Jeep Cherokee" style automobile owned by Shimp's father and insured under a general automobile liability insurance policy, Policy No. AP 3154087, issued by FICH (the FICH auto policy). *Id.* at 29–30; affidavit of Elizabeth Nelander.

Sometime between 4:30 and 5:00 p.m., the group left the beach in the insured vehicle— Shimp driving and Bockhorn and the other women riding as passengers—to return to Kona, where Bockhorn resided. Shimp deposition at 8, 10–11. As Shimp proceeded south on the Queen Kaʻahumanu Highway, he noticed that the temperature gauge of the insured vehicle was abnormally high. *Id.* at 11. The gauge continued to rise, so Shimp slowed the insured vehicle to a stop and parked it approximately twenty feet off the ocean-side edge of the highway. *Id.* at 11–12. While the three women remained in the insured vehicle, Shimp looked under the hood and saw that "steam was coming out everywhere." *Id.* at 12. Shimp decided to pour some water into the radiator from a five-gallon jug kept in the insured vehicle for emergencies, but "[w]hen [he] poured the water in, [he] noticed it was coming out just as fast as [he] was putting it in." *Id.* Accordingly, Shimp concluded that "we weren't going to use the vehicle to go any further" because "the plug where you drain the radiator had blown out." *Id.* For approximately fifteen minutes, Shimp attempted unsuccessfully to repair the insured vehicle. *Id.* at 14.

At that point, according to Shimp's uncontroverted testimony,

> I discussed with all the parties involved what we should do. Should we wait for a police officer or should I go up to the airport, since it was in sight, and they would wait there, or if we should all walk. We were seriously considering waiting for about a half an hour until a police officer came by, and one drove by and didn't stop. That's when the car was steaming, and he did not stop.
>
> So then I discussed further with the girls what to do, and they came to the decision, all of us came to the decision to walk to the airport.

*Id.* at 13. The decision was motivated by the fact that one police officer had already driven by the disabled insured vehicle without stopping; "[t]hat kind of made our mind up that if he's not going to stop, there's probably not going to be another one coming by for a while any ways." *Id.*

The group's objective in proceeding on foot to the airport was to obtain alternative transportation and repair assistance. Order at 3; affidavit of Eric L. Shimp at 2. At about 5:30 p.m., after walking alongside the shoulder of the highway—well clear of the pavement—for twenty to twenty-five minutes and having traveled approximately one mile from the insured vehicle, Shimp heard "a very loud disturbing sound" coming from behind.

Shimp deposition at 11, 14–16, 24. Shimp turned toward the sound in time to see Bockhorn, who was to his immediate left on the highway side, struck by a maroon Honda Accord that was moving "at highway speed." *Id.* at 15–17, 24; exhibit "1" attached to the Shimp deposition. Bockhorn was thrown onto the Accord as it proceeded down the highway; she was carried for approximately the length of a football field before she fell off. *Id.* at 23–24.

Bockhorn sustained fatal injuries and died at the scene of the accident. Order at 2; Shimp deposition at 25–28. The Honda Accord was uninsured. Order at 2. Apparently, the driver was uninsured as well.

As we have noted, at the time of the events described above, the insured vehicle was covered by the FICH auto policy issued to Shimp's father. The "Insuring Agreement" of Part C–1—entitled "Uninsured Motorists Coverage"—provided in relevant part:

> [FICH] will pay damages which a **covered person** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle** because of bodily injury:
>
> 1. Sustained by a **covered person;** and
> 2. Caused by an accident.
>
> <u>The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the **uninsured motor vehicle.**</u>
>
>    . . . .
>
> **"Covered person"** as used in this Part means:
>
> 1. [The named insured, *i.e.,* Shimp's father] or any **family member.**
> 2. Any other person **occupying your covered auto.**
> 3. Any person [*e.g.,* the administrator of a decedent's estate, or a minor claimant's "next friend"] for damages that person is entitled to recover because of bodily injury to which this coverage applies sustained by a person described in 1. or 2. above.
>
> **"Uninsured motor vehicle"** means a land motor vehicle or trailer of any type:
>
> 1. To which no bodily injury liability bond or policy applies at the time of the accident.

> . . . .
>
> 3. Which is a hit and run vehicle whose operator or owner cannot be identified and which <u>hits</u>:
>
>    a. [the named insured] or any **family member;**
>
>    b. a vehicle which [the named insured] or any **family member** are **occupying;** or
>
>    c. [the named insured's] **covered auto.**

(Underscoring added and bold in original.) The general "definitions" section of the FICH auto policy defined **"family member"** to mean "a person related to [the named insured] by blood, marriage or adoption who is a resident of [the named insured's] household." **"Occupying"** was defined to mean "in, upon, getting in, on, out or off." It is undisputed that the insured vehicle was a **"covered auto"** of the named insured and that Shimp was a **"family member".**

At some point after Bockhorn's death, Dawes asserted a claim against FICH for UM benefits, as delineated in the FICH auto policy, for injuries and damages arising from the October 21, 1988 accident. FICH denied Dawes's claim.

On May 16, 1990, Dawes filed a timely complaint in the Third Circuit Court for declaratory judgment against FICH, in which she sought a declaration that the FICH auto policy's UM coverage was available to her to cover damages resulting from the October 21, 1988 accident. FICH answered the complaint on June 25, 1990 and asserted a counterclaim for declaratory judgment against Dawes, in which it sought, inter alia, a declaration that "[FICH] has no obligation to pay [UM] benefits to [Dawes] for any loss or injury arising from the October 21, 1988 . . . accident."

On April 10, 1991, FICH moved the circuit court for an order granting summary judgment in its favor "declaring that [Dawes] is not entitled to [UM] benefits under the subject policy issued by [FICH], on the ground that [Dawes's] decedent, . . . Bockhorn, was not a 'covered person' under the [UM] provisions of the . . . policy at the time she sus-

tained fatal injuries on October 21, 1988." On May 15, 1991, Dawes filed a cross-motion for summary judgment seeking the converse relief, namely, an order declaring that Bockhorn *was* a "covered person" under the FICH auto policy at the time of the accident.

The two motions came on for hearing on May 21, 1991. Counsel for Dawes and FICH agreed that there were no genuine issues of material fact and that the case was ripe for summary judgment in favor of one party or the other. 5/21/91 Tr. at 3, 25. The hearing consisted almost exclusively of a thorough and probing colloquy between the circuit court and the parties regarding the proper application of *Olson, supra,* to the undisputed facts of the case, at the end of which the circuit court took the matter under advisement.

On June 5, 1991, the circuit court entered an order granting summary judgment in favor of FICH and against Dawes on the basis that "[a]t the time of the subject accident[,] Elizabeth Bockhorn was not occupying the insured vehicle, was not in the immediate proximity of the insured vehicle[,] and was not engaged in maintenance or use of the insured vehicle."

Dawes filed a timely notice of appeal on July 1, 1991.

## II. *STANDARD OF REVIEW*

On appeal, an award of summary judgment is reviewed under the same standard applied by the trial courts. Under Hawai'i Rules of Civil Procedure Rule 56(c), summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Kaneohe Bay Cruises, Inc. v. Hirata,* 75 Haw. 250, 258, 861 P.2d 1, 6 (1993) (citing *Gossinger v. Association of Apartment Owners of The Regency Ala Wai,* 73 Haw. 412, 417, 835 P.2d 627, 630 (1992)).

*Sol v. AIG Hawai'i Ins. Co.,* 76 Hawai'i 304, 306, 875 P.2d 921, 923, *reconsideration denied,* 76 Hawai'i 353, 877 P.2d 890 (1994); *see also Sentinel Ins. Co., Ltd. v. First Ins. Co. of Hawai'i, Ltd.,* 76 Hawai'i 277, 287, 875 P.2d 894, 904 (1994) (citations omitted).

## III. *DISCUSSION*

### A. *General Legal Principles, Controlling Hawai'i Statutes, And The Plain Language Of The FICH Policy*

We begin our analysis with the observation that " 'liability insurers have the same rights as individuals to limit their liability, and to impose whatever conditions they please on their obligation, provided they are not in contravention of statutory inhibitions or public policy.' " *First Ins. Co. of Hawai'i, Inc. v. State,* 66 Haw. 413, 423, 665 P.2d 648, 655 (1983) (quoting 6B Appleman, *Insurance Law and Practice* § 4255, at 40 (1979) [hereafter Appleman] ). As such, "[insurance] policies are subject to the general rules of contract construction; the terms of the policy should be interpreted according to their plain, ordinary, and accepted sense in common speech unless it appears from the policy that a different meaning is intended[.]" *Id.* at 423–24, 665 P.2d at 655 (citations omitted). Moreover, "[every] insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy[.]" Hawai'i Revised Statutes (HRS) § 431:10–237 (1987 Spec. Pamphlet); *see State Farm Mut. Auto. Ins. Co. v. Fermahin,* 73 Haw. 552, 556, 836 P.2d 1074, 1077 (1992); *Smith v. New England Mutual Life Ins. Co.,* 72 Haw. 531, 534, 827 P.2d 635, 636 (1992).

Nevertheless, adherence to the plain language and literal meaning of insurance contract provisions is not without limitation. We have acknowledged that "[b]ecause insurance policies are contracts of adhesion and are premised on standard forms prepared by the insurer's attorneys, we have long subscribed to the principle that they must be construed liberally in favor of the insured and [any] ambiguities [must be] resolved against the insurer." *Sturla, Inc. v. Fireman's Fund Ins. Co.,* 67 Haw. 203, 209, 684 P.2d 960, 964 (1984) (citations and internal quotation marks omitted) (cited with approval in *Fermahin,* 73 Haw. at 556, 836 P.2d at 1077). "Put another way, the rule is that policies are to be construed in accord with the reasonable expectations of a layperson." *Id.* In addition, "[insurance] policies are governed by statutory requirements in force

and effect at the time such policies are written. . . . Such provisions are read into each policy issued thereunder [ ] and become a part of the contract with full binding effect upon each party." *AIG Hawai'i Ins. Co., Inc. v. Estate of Caraang,* 74 Haw. 620, 633, 851 P.2d 321, 328 (1993) (citations and internal quotation marks omitted).[1] Consequently, "[w]hen the terms of an insurance contract are in conflict with statutory language, the statute must take precedence over the terms of the contract." *Sol,* 76 Hawai'i at 307, 875 P.2d at 924; *see also Methven–Abreu v. Hawaiian Ins. & Guar. Co., Ltd.,* 73 Haw. 385, 395–96, 834 P.2d 279, 285, *reconsideration denied,* 73 Haw. 625, 838 P.2d 860 (1992); *Olson,* 69 Haw. at 563–64, 751 P.2d 666, 669 (1988); *Walton v. State Farm Mut. Auto. Ins. Co.,* 55 Haw. 326, 328, 518 P.2d 1399, 1400–01 (1974); *Columbia Casualty Co. v. Hoohuli,* 50 Haw. 212, 214–15, 437 P.2d 99, 102 (1968).

As of October 21, 1988, UM coverage under the FICH auto policy was primarily governed by the provisions of two Hawai'i statutes. The first, HRS § 431:10–213 (1987 Spec. Pamphlet),[2] provided in relevant part:

**Automobile liability; coverage for damage by uninsured or underinsured motorist.** (a) No automobile liability or motor vehicle liability policy insuring against loss for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be delivered, issued for delivery, or renewed in this State unless the policy provides coverage for the protection of the persons insured who are legally entitled to recover damages from owners or operators of uninsured motor vehicles.[3]

. . .

The second, HRS § 431:10C–301 (1987 Spec. Pamphlet),[4] provided in relevant part:

**Required motor vehicle policy coverage.**

. . . .

(b) A motor vehicle insurance policy shall include:

. . . .

(3) With respect to any motor vehicle registered or principally garaged in this State, liability coverage . . . for bodily injury or death . . . for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom; provided, however, that the coverage required under this section shall not be applicable where any insured named in the policy shall reject the coverage in writing.

As a general proposition, UM statutes such as HRS §§ 431:10–213 and 431:10C–301(b)(3)

---

**1.** FICH issued its auto policy to Shimp's father on June 21, 1988; the policy period commenced on that date and remained in effect through December 21, 1988. Affidavit of Elizabeth Nelander at 1.

**2.** HRS § 431:10–213 (1987 Spec. Pamphlet) was repealed by Act 195, § 43, 1989 Haw.Sess.Laws 374, 388. There is no specific legislative history as to why, other than that "this housekeeping measure [was] necessary to maintain continuity within the Insurance Code [*i.e.,* HRS ch. 431]." Sen.Conf.Comm.Rep. No. 66, in 1989 Senate Journal, at 787; Hse.Conf.Comm.Rep. No. 132, in 1989 House Journal, at 817. Presumably, HRS § 431:10–213 was deleted from the Insurance Code because it was substantially duplicative of HRS § 431:10C–301 (1987 Spec.Pamphlet & Supp.1992).

**3.** HRS § 431:10C–103(23)(A) (1987 Spec.Pamphlet & Supp.1992) defines "uninsured motor vehicle" to include "[a] motor vehicle for which there is no bodily injury liability insurance or self-insurance applicable at the time of the accident[.]" HRS § 431:10C–103(9) (1987 Spec.Pamphlet) defines "motor vehicle accident" to mean "an accident arising out of the operation, maintenance, or use of a motor vehicle, including an object drawn or propelled by a motor vehicle." Although the term "accident" is statutorily undefined, HRS § 431:10C–103(1) (1987 Spec.Pamphlet) defines "accidental harm" to mean "bodily injury, death, sickness, or disease caused by a motor vehicle accident to a person." For a discussion of the conditions that render bodily injury or death "accidental," *see AIG Ins. Co., Inc. v. Estate of Caraang,* 74 Haw. 620, 635–36, 851 P.2d 321, 328–29 (1993).

**4.** The legislature effected non-substantive amendments to HRS § 431:10C–301(b)(3) in 1988 and 1992. *See* Act 306, § 1, 1988 Haw.Sess.Laws 575–76; Act 123, § 4, 1992 Haw.Sess.Laws 202, 208–09.

are considered to be remedial in nature[5] designed to afford maximum protection to a state's residents, and to fill the gaps in compulsory insurance plans. Their purpose is to provide a remedy where injury is caused by an uninsured motorist; or, as has been more frequently stated, to provide a remedy to the innocent victims of irresponsible motorists who may have no resources to satisfy the damages they cause.[6] This recourse [ ] is provided, then, to cover the situation of a wrongful or tortious act of an uninsured motorist or a hit and run driver, or that of another unknown motorist.

... Ideally, the purpose is to place those insured in the same position they would have occupied had the tortfeasor carried liability insurance....

8C Appleman § 5067.45, at 41–46 (1981) (footnotes omitted).

■ Being remedial statutes, HRS §§ 431:10–213 and 431:10C–301(b)(3) are "to be construed liberally in order to accomplish the purpose for which [they were] enacted.... [Remedial] statutes are liberally construed to suppress the [perceived] evil and advance the [enacted] remedy." *Flores v. United Air Lines, Inc.,* 70 Haw. 1, 12, 757 P.2d 641, 647 (1988) (citations and internal

quotation marks omitted) (some brackets in original).

■ Two general principles apply to UM insurance coverage. First, *either* "[a]n insured *or* an insured vehicle must be involved in the accident in order to collect under the UM endorsement." 12A J. Couch, *Cyclopedia of Insurance Law* § 45:634, at 127 (R. Anderson and M. Rhodes 2d ed. 1981) [hereafter Couch] (emphasis added). This is because "[t]he uninsured motorist policy is personal to the insured[,]" *Palisbo v. Hawaiian Ins. & Guar. Co., Ltd.,* 57 Haw. 10, 15, 547 P.2d 1350, 1354 (1976) (emphasis added), or, put differently, the UM coverage follows the insured's person. Accordingly,

[t]he nature of uninsured motorist insurance is such that an insured is covered whether or not he or she is injured while in a vehicle which is insured under the policy.... [A]n insured under the ... policy .:. [is] entitled to recover uninsured motorist insurance benefits ... even though she [is] injured while operating a vehicle not covered by the policy.

*Allstate Ins. Co. v. Morgan,* 59 Haw. 44, 47–48, 575 P.2d 477, 479–80 (1978). Second, "almost all modern forms of UM coverage

---

**5.** *See Methven–Abreu v. Hawaiian Ins. & Guar. Co., Ltd.,* 73 Haw. 385, 395–96, 834 P.2d 279, 285, *reconsideration denied,* 73 Haw. 625, 838 P.2d 860 (1992) (Hawai'i UM statute "was to be 'liberally construed to accomplish its *remedial purposes* and give effect to the legislative intent.'") (quoting *Kau v. State Farm Mut. Auto. Ins. Co.,* 58 Haw. 49, 51, 564 P.2d 443, 444 (1977)) (emphasis added).

"Generally, remedial statutes are those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries." N. Singer, 3 *Sutherland, Statutes and Statutory Construction* § 60.02 (4th ed. 1986) (footnote omitted).... "Modern social legislation is generally regarded as being remedial in nature. 'Socioeconomic' legislation has been said to be entitled to a liberal construction." *Id.*

*Flores v. United Air Lines, Inc.,* 70 Haw. 1, 12 n. 8, 757 P.2d 641, 647 n. 8 (1988).

**6.** The relevant Hawai'i legislative history is in accord.

The purpose of [UM coverage] is to promote protection, through voluntary insurance, for persons who are injured by uninsured motorists who cannot pay for personal injuries caused by motor vehicle accidents. The bill would require all companies writing policies insuring against liability for personal injuries and property damages to offer to their clients "uninsured motorist protection".

... [Claims] become[ ] payable when the innocent victim shows that his claim is valid, that is, that there is legal liability on the person alleged to be responsible and that the claim cannot be collected because of the financial irresponsibility of that person or because of the inability to identify the person or persons responsible.

In testimony ..., instances have been cited where persons have suffered extensive personal injuries and property damages and found that the guilty motorist was financially irresponsible and without any liability insurance. Your Committee believes that if the general public knows about the availability of such insurance, and if the insurance companies are compelled to offer it, many of these tragic consequences can be avoided.

Hse.Stand.Comm.Rep. No. 194, in 1965 House Journal, at 582. *See also* Sen.Stand.Comm.Rep. No. 429, in 1965 Senate Journal, at 1013–14.

include *passengers,*[7] or occupants, of an automobile injured by an uninsured motorist; indeed an exclusion of them would, in most states, be invalid." 8C Appleman § 5080.45, at 255–56 (1981) (footnote omitted and emphasis added).

Construing a statute similar in all material respects to HRS §§ 431:10–213 and 431:10C–301(b)(3), the Connecticut Supreme Court aptly elaborated upon these general principles as follows:

> ... [R]equired uninsured motorist coverage is "person oriented." ... [T]he public policy embodied in [the UM statute] directs that uninsured motorist coverage be provided to insureds when they are not occupants of insured vehicles as well as when they are.
>
> Our uninsured motorist insurance statute ... provides coverage for *"persons* insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles...."* (Emphasis added.) The coverage attaches to the insured person, not the insured vehicle. Thus, this court has held that an injured party may receive the benefits of a policy even though not occupying a vehicle insured under that policy....
>
> ....
>
> An insured's status at the time of the injury, whether passenger, pedestrian, or driver of an insured or uninsured vehicle,

is irrelevant to recovery under the statutorily mandated coverage. The coverage is portable: The insured and family members ... are insured no matter where they are injured. They are insured when injured in an owned vehicle named in the policy, in an owned vehicle not named in the policy, in an unowned vehicle, on a motorcycle, on a bicycle, whether afoot or on horseback or even on a pogo stick or in a rocking chair on [one's] front porch. *Uninsured motorist statutes place no geographical limits on coverage* and do not purport to tie protection against uninsured motorists to occupancy of an insured vehicle. Uninsured motorist protection of coverage for persons, not for vehicles.

*Harvey v. Travelers Indem. Co.*, 188 Conn. 245, 248, 250, 449 A.2d 157, 159–60 (1982) (citations and internal quotation marks omitted) (emphasis added).

■ Consistent with the foregoing principles and pursuant to the "insuring agreement" of the UM coverage section of its auto policy (Part C–1), FICH obligated itself to pay damages: (1) sustained by a "covered person"; (2) which the "covered person" is legally entitled to recover from the owner of operator of an uninsured motor vehicle; (3) arising out of the ownership, maintenance, or use of the uninsured motor vehicle;[8] and (4) which is caused by an accident.

---

7. "Passenger" has been defined to mean "any *occupant* of a vehicle other than the person operating it." *Black's Law Dictionary* 1123 (6th ed. 1990) (emphasis added). Thus, for purposes of UM coverage, a "passenger" is synonymous with a "person occupying" a "covered auto."

8. The dissent recasts "the central inquiry governing Bockhorn's entitlement to [UM] coverage" as "whether her death arose out of the 'ownership, maintenance or use' of the vehicle" (*i.e.*, the "covered auto" under the FICH auto policy) as that term is utilized in HRS § 431:10–213 and defined in HRS § 431:10C–103(13). Dissenting opinion 134, 136 & n. 2, 883 P.2d 55, 57 & n. 2. In doing so, the dissent both misapprehends the significance of the phrase "ownership, maintenance or use" contained in HRS § 431:10–213, within the context of *UM coverage,* and ignores the plain language of the FICH policy.

As we have indicated, at the time of the accident causing Bockhorn's death, HRS § 431:10–213(a) (the sole subject of which was UM coverage) provided, inter alia, that all auto liability policies issued in Hawai'i and "insuring against loss for bodily injury or death suffered by any person arising out of the ownership, *maintenance or use* of a motor vehicle" were required to provide "coverage for the protection of the persons insured who are *legally entitled to recover damages from owners or operators of uninsured motor vehicles."* (Emphasis added.) *See supra* at 122, 883 P.2d at 43. At the same time, HRS § 431:10C–301(b)(3), with which HRS § 431:213(a) must be read *in pari materia, see* dissenting opinion at 134, 883 P.2d at 55, and which survived the latter's repeal in 1989, *see supra* note 2, required that the same auto liability policies include coverage "for the protection of persons insured thereunder who are *legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, ... including death...."* (Emphasis added.) *See supra* at 122, 883 P.2d at 43.

It is significant that the phrase "operation, maintenance, or use" nowhere appears in HRS § 431:10C–301(b)(3), which deals exclusively with *UM coverage,* although it does appear in

■ On the record before the circuit court, and by the plain language of the FICH auto policy, it is uncontrovertible that: (1) Dawes, at least in her capacity as administrator of Bockhorn's estate, sustained damages; (2) the damages arose out of the use (*i.e.*, operation) of the maroon Honda Accord, which was uninsured; (3) the damages were caused by an accident; and (4) Dawes is legally entitled to recover from the operator of the Accord. Thus, the outcome-dispositive issue in the present appeal is whether, at the time of the accident, Dawes's decedent, Bockhorn, was a "covered person" within the meaning of the FICH auto policy, as constrained by the public policy underlying HRS §§ 431:10–213 and 431:10C–301(b)(3).

those provisions of the statute dealing with the insured's *liability coverage*. Specifically, HRS § 431:10C–301 (1987 Spec.Pamphlet) provides in relevant part:

> **Required motor vehicle policy coverage.** (a) ... [A]n insurance policy covering a motor vehicle shall provide:
>
> ....
>
> (2) Insurance to pay on behalf of the owner or any operator of the insured motor vehicle using the motor vehicle with the express or implied permission of the named insured, sums which the owner or operator may legally be obligated to pay for injury [or] death ... which arise[s] out of the ownership, <u>operation, maintenance, or use</u> of the motor vehicle.
>
> (b) A motor vehicle insurance policy shall include:
>
> (1) Liability coverage ... for all damages arising out of accidental harm sustained by any ... person as a result of any ... accident ... arising out of ownership, <u>maintenance, use,</u> loading, or unloading of the insured vehicle[.]

(Bold in original and underscoring added.)

Nevertheless, the dissent suggests that "the 'ownership, maintenance or use' clause clearly applies to HRS § 431:10C–301(b)(3), notwithstanding the absence of those terms in that subsection, and the scope of coverage mandated by the statute must be interpreted accordingly." Dissenting opinion at 135, 883 P.2d at 56. The dissent then posits that "[t]he issue thus is: to whom do the terms apply, the uninsured motorist or the claimant?" *Id.* For the reasons set forth *infra* in this footnote, the answer to the dissent's question is a qualified "both." The term "operation, maintenance, or use" applies to *insured* tortfeasors who operate, maintain, or use a "covered auto," as defined in the general definitions section of the FICH auto policy, and who

## B. *Public Policy, Pedestrians As "Covered Persons," The Olson Analysis, And "Immediate Proximity To The Vehicle"*

As the foregoing analysis demonstrates, Bockhorn was obviously a "covered person" under the FICH auto policy during the period of time when she was a *passenger* in the insured vehicle, because she was unquestionably a "person occupying" the "covered auto." It is therefore equally obvious that, had Bockhorn been struck and killed by the uninsured Honda Accord while a passenger in the insured vehicle, the declaratory judgment action giving rise to the present appeal would never have been filed, because FICH would have readily acceded to Dawes's claim for UM benefits. Accordingly, the fact that Bockhorn was not "occupying" (*i.e.*, "in, upon, getting in, on, out or off") the insured

FICH has a contractual duty to indemnify and defend, as well as to tortfeasors who operate *uninsured* motor vehicles and against whom "covered persons," as defined in the insuring agreement of the FICH auto policy's UM coverage provisions, assert claims. The term does *not* apply to "covered persons" under the UM provisions of the FICH auto policy. In this connection, the dissent conveniently ignores the highlighted language, set forth *supra* in this footnote, of both HRS §§ 431:10–213(a) and 431:10C–301(a)(2), in addition to the language of HRS § 431:10C–301(b)(3).

It is patently obvious from the plain language of the statutory scheme set forth above that the "operation, maintenance, or use" triggering *UM coverage* is that of the "owner[ ] or operator[ ] of [the] uninsured motor vehicle[ ]" causing injury and *not* that of the injured insured or "covered" person claiming entitlement to UM benefits. *See* HRS §§ 431:10–213(a) and 431:10C–301(b)(3). By the same token, it is equally obvious that the "operation, maintenance, or use" triggering auto liability insurance protection is that of the owner or operator of the insured motor vehicle who is claiming the protection. For that reason, reading HRS § 431:10–213(a) *in pari materia* with HRS § 431:10C–103(13) (1987 Spec.Pamphlet), *see* dissenting opinion at 136 & n. 2, 883 P.2d at 57 & n. 2, is of no assistance to the dissent's theory. It is hardly "front page news" that an *insured or uninsured tortfeasor* cannot "operate" or "use" an *insured or uninsured motor vehicle* without "occupying, entering into or alighting from it[.]"

In light of the above, it is not surprising that the UM coverage provisions of the FICH auto policy at issue in the present case obligated FICH to pay damages to an accidentally injured "covered person" whose injuries arose "out of the ownership, maintenance or use of [an] **uninsured motor vehicle**" (bold in original). *See supra* at 120, 883 P.2d at 41.

vehicle *at the moment of the accident* gives rise to the present question on appeal.

Such would not be the case, however, if it had been *Shimp,* and not Bockhorn, who had been struck and killed by the uninsured Accord as the group trekked to the Kona Airport to obtain alternative transportation and repair assistance following the breakdown of the insured vehicle. Under such hypothetical circumstances, there would be *no* geographical limits placed on Shimp's coverage, which would in no way be tied to occupancy of the insured vehicle, the same being designed to protect Shimp's person and not the vehicle he had been driving. *See Harvey, supra.* This is because the FICH auto policy purports to create two distinct classes of "covered persons": (1) the named insured and his or her family members, such as Shimp; and (2) any other person "occupying" the "covered auto."

The "two class" paradigm of "covered persons" typically reflected in UM policies, including the FICH auto policy, is described in the scholarly treatises as follows:

> ... [Uninsured] motorist coverage ... creates two classes of persons who can recover: on the one hand, the named insured, and while resident of the same household, the spouse of any such named insured, and relatives of either; and on the other, those who use, with the consent, express or implied of the named insured, the vehicle to which the policy applies and those who are guests in such vehicle.... And second group persons are only covered when an accident takes place while they are occupying, operating or using the insured vehicle. This is to be contrasted with the fact that first group persons are not required to be associated with the insured auto in order for coverage to attach.... *Coverage for the first of the classes listed above, but not for the second,*

*extends to an injury suffered while a pedestrian.*

12A Couch § 45:635, at 130–32 (footnotes omitted and emphasis added). Appleman characterizes the dichotomy in this way:

> ... [A] line of distinction frequently is drawn between persons of the first class and of the second class. Injury received as a pedestrian generally is limited to the former, at least *unless some connection with the insured vehicle is shown.* Thus even though such persons are travelling together, a different result may follow where injury is received by each. While a pedestrian's right to recover against his insurer may depend upon the legal liability of the uninsured motorist to him, not every departure from a vehicle necessarily divorces one from his status as a covered passenger. One may be considered still to be "occupying" the vehicle if in reasonable relationship to it at the time of injury.... Generally, the court will take a liberal look at any situation, conferring coverage if it seems desirable where one is not in proximity to the vehicle, while denying a defense to the insurer where the individual was closer, physically, to the automobile....

8C Appleman § 5092.35, at 381–82, 386–87 (footnotes omitted and emphasis added).

Recognizing the necessity of "some connection with the insured vehicle" in order for injured "class two" persons to be entitled to UM benefits, some courts have resorted to the fiction that "use" of the insured vehicle is synonymous with its "occupancy"[9] and have devised complex and elaborate formulae for determining when such "use" has been established. For example, the Washington Court of Appeals has proffered the following "test":

> ... [W]hether a person can be considered as "using" a motor vehicle and thus an insured under an uninsured motorist endorsement depends on the factual con-

---

9. Relying on the *Olson* analysis discussed below, this court came to the interesting conclusion that, for purposes of establishing the proper source of *no-fault coverage,* the insured person in question, who had suffered personal injury, was simultaneously a pedestrian and an occupant of her own insured vehicle, having decided to "construe the term 'vehicle occupied by the injured person' as being coextensive with the term 'operation, maintenance or use' as used in HRS Chapter 294 [*i.e.,* the Motor Vehicle Accident Reparation Act—the precursor to HRS ch. 431]." *Colonial Penn Ins. Co. v. First Ins. Co. of Hawai'i, Ltd.,* 71 Haw. 42, 44, 780 P.2d 1112, 1114 (1989).

text of each case provided, however, that at least the following four criteria are met as of the time of the injury: (1) there must be a causal relation or connection between the injury and the use of the insured vehicle; (2) the person asserting coverage must be in a reasonably close geographic proximity to the insured vehicle, although the person need not be actually touching it; (3) the person must be vehicle oriented rather than highway or sidewalk oriented at the time; and (4) the person must also be engaged in a transaction essential to the use of the vehicle at the time.

*Rau v. Liberty Mut. Ins. Co.*, 21 Wash.App. 326, 334, 585 P.2d 157, 162 (1978) (citations omitted).

Efforts such as that in *Rau* to establish "some connection with the insured vehicle," 8C Appleman § 5092.35 at 381, in order to extend the benefits of UM coverage to "class two" persons, fail, however, to avoid the anomaly that when "class one" and "class two" persons "are travelling together, a different result may follow where injury is received by each." *Id. See, e.g., Kaysen v. Federal Ins. Co.*, 268 N.W.2d 920 (Minn.1978) (officer-director of corporate named insured struck and killed by uninsured motorist after alighting from company auto; UM coverage extended to him by operation of law but did not extend to officer's wife, a passenger in same company auto, killed in same accident).

It is apparent to us that application of the *Rau* test would result in the same anomaly had Shimp and Bockhorn *both* been struck and killed by the uninsured Honda Accord in the present case. For the reasons discussed below, we believe as a matter of law that

there was a "causal relation or connection between [Bockhorn's death] and the use of the insured vehicle," *Rau*, 21 Wash.App. at 334, 585 P.2d at 162.[10] Nevertheless, in our view, a determination as to whether Bockhorn was "vehicle oriented rather than highway or sidewalk oriented at the time" of her death, *id.*, and whether she was "engaged in a transaction essential to the use of the [insured] vehicle at the time," *id.*, would be nothing more than a conclusory and self-serving exercise in semantic game playing. Moreover, we do not believe, on the record before us, that any reasonable trier of fact could find that Bockhorn was "in a reasonably close geographic proximity to the insured vehicle," *id.*, at the time of the accident; accordingly, it is apparent as a matter of law that she was not.

Thus, in the hypothetical circumstances posed in the previous paragraph, Shimp, as a covered "family member," would be entitled to UM benefits but Bockhorn would not, although both had been occupants of the insured vehicle and both were identically situated with respect to the uninsured Honda Accord. In light of the remedial purpose of HRS §§ 431:10–213 and 431:10C–301(b)(3) "to promote protection ... for persons who are injured by uninsured motorists who cannot pay for personal injuries caused by motor vehicle accidents" and to effect a means of recovery "when the innocent victim shows ... that there is legal liability on the person alleged to be responsible and that the claim cannot be collected because of the financial irresponsibility of that person," [11] such a result is absurd.[12] "This court has recognized

---

**10.** We make this observation only for purposes of assessing the viability of the *Rau* test. As we have indicated, with respect to Dawes's entitlement to UM benefits in the present case, the only vehicle the "use" of which is at issue is the uninsured maroon Honda Accord that caused Bockhorn's death. *See supra* note 8. As a pedestrian at the time of the fatal accident, Bockhorn was a "covered person" under the UM provisions of the FICH auto policy as a function of her "connection with the insured vehicle," *i.e.*, the "Jeep Cherokee" style automobile owned by Shimp's father, and not her "use" of it. *See* 8C Appleman § 5092.35, at 381–82. It is for this reason that the dissent is simply mistaken when it characterizes "a causal connection between [Bockhorn's] *use* of the [insured vehicle] and

[Bockhorn's] injury" as "the critical element," dissenting opinion at 143, 883 P.2d at.64 (emphasis added), and when it suggests that "Bockhorn's very argument for relief from the 'occupancy' restriction of the policy ... necessarily rests on the fact that 'operation, maintenance or use,' as set forth in the statute, ... applies to her," *id.* at 136, 883 P.2d at 57.

**11.** *See supra* note 6 and accompanying text.

**12.** The dissent seeks to rationalize the hypothetically disparate treatment of Shimp and Bockhorn described above as follows:

... Shimp and his family are covered for bodily injury or death under their UM policy as

that departure from a literal construction of a statute 'is justified when such construction would produce an absurd ... result and the literal construction in the particular action is clearly inconsistent with the purposes and policies of the act.'" *Richardson v. City and County of Honolulu,* 76 Hawai'i 46, 60, 868 P.2d 1193, 1207, *reconsideration denied,* 76 Hawai'i 247, 871 P.2d 795 (1994) (quoting *Franks v. City and County of Honolulu,* 74 Haw. 328, 341, 843 P.2d 668, 674 (1993) (internal quotation marks deleted)). *See also Richardson,* 76 Hawai'i at 68–69, 868 P.2d at 1215–16 (Klein, J., dissenting). Moreover, we believe that to construe the FICH auto policy's promise to "pay damages which a **covered person** is legally entitled to recover from the ... operator of an **uninsured motor vehicle** because of bodily injury ... [caused] by an accident ... aris[ing] out of the ... use of the **uninsured motor vehicle**" (emphasis in original) as contemplating such a result would not be "in accord with the reasonable expectations of a layperson." *See Sturla, Inc.,* 67 Haw. at 209, 684 P.2d at 964. Indeed, we believe that a layperson would be shocked to learn that such a result could be reached by way of legal intellectual gymnastics.

We return to the longstanding propositions, cited in Section III.A. of this opinion, that liability insurers may not limit their liability "in contravention of statutory inhibitions or public policy," *First Ins. Co. of Hawai'i, Inc.,* 66 Haw. at 423, 665 P.2d at 655, and that "[w]hen the terms of an insurance contract are in conflict with statutory language, the statute must take precedence over the terms of the contract." *Sol,* 76 Hawai'i at 307, 875 P.2d at 924; *Methven–Abreu,* 73 Haw. at 395–96, 834 P.2d at 285; *Olson,* 69 Haw. at 563–64, 751 P.2d at 669; *Walton,* 55 Haw. at 328, 518 P.2d at 1400–01; *Columbia Casualty Co.,* 50 Haw. at 214–15, 437 P.2d at 102.

In this connection, we note that the UM coverage set forth in Part C–1 of the FICH auto policy contains five provisions that this court has voided in the past as being in contravention of statutory inhibitions or public policy. First, in *DeMello v. First Ins. Co. of Hawai'i, Ltd.,* 55 Haw. 519, 523 P.2d 304 (1974), we struck down, as contrary to the protective purpose of the Hawai'i UM statutes and the public policies implicit therein,

pedestrians *because they bargained and paid for the coverage.* Here, the patent, sensible, and ultimately fair distinction ... between Shimp and Bockhorn is that Bockhorn never paid a single premium to the insurer; accordingly she is not entitled to the same *scope of coverage* as Shimp.

Dissenting opinion at 140, 883 P.2d at 61 (emphasis in original). Whether or not the distinction is "patent," we submit that it is anything but "sensible" or "ultimately fair." Shimp's father, not Shimp himself, was the named insured under the FICH auto policy; Shimp is a "covered person" under the UM provisions of the policy only because he falls within the policy's definition of a "family member." *See supra* at 120, 883 P.2d at 41. In that sense, Shimp and Bockhorn are both third party beneficiaries of the insurance contract between FICH and Shimp's father. There is absolutely no evidence in the record that Shimp paid FICH any consideration for his UM coverage. To suggest that "they [*i.e.,* Shimp and his family] bargained and paid for the coverage" is, at the very least, misleading.

Moreover, the dissent's attempt to explain why Shimp would be entitled to UM benefits, had he rather than Bockhorn been injured under the circumstances of this case, further underscores the internal inconsistency of the dissent's fundamental premise. The dissent advises that "any test purporting to effectuate the legislative intent underlying the plain meaning and legislative history of HRS §§ 431:10–213 and 431:10C–103(13) at the very least must incorporate a reasonable physical proximity limitation[.]" Dissenting opinion at 144, 883 P.2d at 65. If this were true, then *neither* Shimp *nor* Bockhorn would be entitled to UM benefits, unless a distance of approximately one mile from the location of the insured vehicle is considered "reasonably proximate." The dissent seeks to refute this fact by attempting to limit the reasonable physical proximity limitation to "non-family members who 'occupy' the [insured] vehicle" and by suggesting that "coverage as to 'family members,' like Shimp, remains valid[.]" *Id.* at 140, 883 P.2d at 61. In making such an argument, the dissent is trying to have it both ways. Either HRS § 431:10C–103(13) contains a blanket "reasonable physical proximity" limitation or it does not. If it does, then the limitation applies across the boards as a constraint on UM coverage, and Shimp, under the circumstances of this case, would be unlawfully deprived of the protection to which both we and the dissent agree that he is entitled.

that portion of the FICH auto policy's definition of an "uninsured motor vehicle" requiring that a "hit and run vehicle" actually "hit" (*i.e.*, make "physical contact" with) either a covered person, the vehicle that a covered person is occupying, or the covered auto (*i.e.*, the insured motor vehicle). Second, in *Kau v. State Farm Mut. Auto. Ins. Co.*, 58 Haw. 49, 564 P.2d 443 (1977), and again in *Methven–Abreu, supra,* we voided, as violative of our UM statutes and contrary to public policy, the "owned vehicle" exclusion in the FICH auto policy [13] attempting to preclude an insured from recovering UM benefits on the basis that the insured's injuries were sustained while occupying a vehicle not specifically declared under the policy. Third, to the extent that the FICH auto policy's attempt to reduce its UM benefits by all sums "[paid] or payable because of the bodily injury under [workers' compensation laws, disability benefits law,] or similar law" extends to no-fault benefits payable under any auto policy sustained by a covered person, we voided the provision in *Sol, supra*.[14] *Cf. Caberto v. National Union Fire Ins. Co.*, 77 Hawai'i 39, 41, 43–44, 881 P.2d 526, 528, 530–531 (1994) (having exempted UM coverage from no-fault reimbursement in *Sol*, this court held that (1) *underinsured* motorist (UIM) coverage "is likewise exempt from no-fault reimbursement," and (2) provision of insurance policy "requiring reimbursement of no-fault benefits from UIM proceeds is void"). Fourth, in *Walton, supra,* we voided

the "other insurance" clause of the FICH auto policy,[15] which seeks to limit the recovery of UM benefits by a covered person to less than actual damages or the limit of liability stated in the policy. Fifth, and most important for present purposes, in *Olson, supra,* we voided, as conflicting with the Hawai'i UM statutes, that portion of the FICH auto policy's "insuring agreement" regarding UM coverage that requires that "covered persons" other than the named insured and "family members" be "occupying [a] covered auto" (*i.e.*, be occupying an insured vehicle) at the time of injury. Such, apparently, is the deference that FICH accords the law of this state when it comes to issuing auto policies consonant therewith.

Given that the plain language of the FICH auto policy, as "interpreted according to [its] plain, ordinary, and accepted sense in common speech," *see First Ins. Co. of Hawai'i, Inc.*, 66 Haw. at 424, 665 P.2d at 655, includes passengers within the definition of "covered persons," and bearing in mind that "class two covered persons" such as Bockhorn, *see* 12A Couch § 45:635, at 130–31, need not be "occupants" of an insured vehicle, *see Olson, supra,* but must have "some connection with the insured vehicle" in order to be entitled to UM benefits, *see* 8C Appleman § 5092.35, at 381, we now reach the heart of Dawes's appeal: was Bockhorn a "covered person" under the FICH auto policy at the time of the accident or was she not?

**13.** The "exclusions" section of the FICH auto policy, Part C–1 (UM Coverage), provides in relevant part:

A. We do not provide Uninsured Motorists Coverage for bodily injury sustained by any person:
1. While **occupying**, or when struck by, any motor vehicle owned by [the named insured] or any **family member** which is not insured for this coverage under this policy....
(Emphasis in original.)

**14.** We acknowledge both that *Sol v. AIG Hawai'i Ins. Co.*, 76 Hawai'i 304, 875 P.2d 921, *reconsideration denied,* 76 Hawai'i 353, 877 P.2d 890

(1994), was handed down well after FICH initially denied Dawes's claim for UM benefits and that the central issue presented in *Sol* is not material to this case.

**15.** The "other insurance" section of the FICH auto policy, Part C–1, provides:

If there is other applicable similar insurance, we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. However, any insurance we provide with respect to a vehicle [the named insured] do[es] not own shall be excess over any other collectible insurance.

If the answer to the question is "yes," then Dawes is entitled to UM benefits as a matter of law; if the answer is "no," then Dawes is not entitled to UM benefits as a matter of law. For us to resolve the issue, we must revisit this court's analysis in *Olson*.

In *Olson*, an insurer issued an auto policy containing UM coverage, identical in all material respects to the FICH auto policy, to International Life Support, Inc. (ILS), an emergency ambulance service. The crew of one of ILS's ambulances consisted of Olson, an emergency medical technician trained in basic life support care, and Jones, a mobile intensive care technician qualified to administer more advanced life support procedures. ILS was the named insured under the auto policy covering the ambulance, and Olson and Jones, not being "family members" of ILS, fell into the policy's category of insureds designated "anyone else occupying a covered auto."

On the evening in question, the ambulance crew responded to an automobile accident call. The crew encountered a motorcycle laying partially in the roadway. A man with a flashlight was attempting to direct traffic, the police not having yet arrived at the accident scene. Jones instructed Olson to set flares on the roadway. Olson exited the ambulance and obtained a flare from the rear of the vehicle; he then walked to the center of the road to place the flare. While in the roadway attempting to light the flare, Olson was struck and injured by an uninsured motor vehicle driven by an uninsured motorist.

As a result of Olson's personal injury, the insurer commenced a declaratory judgment action in the United States District Court for the District of Hawai'i. Although the outcome of the proceeding at the district court level is unclear, the matter was appealed to the United States Court of Appeals for the Ninth Circuit. Pursuant to Hawai'i Rules of Appellate Procedure 13, the Ninth Circuit certified three questions to this court; for present purposes, the relevant question inquired whether the statutory predecessors to HRS §§ 431:10–213,[16] 431:10C–103(13),[17] and 431:10C–301 permitted UM coverage to be restricted to persons "occupying" an insured vehicle. Not surprisingly, the insurer urged, inter alia, that the policy provision controlled and that Olson was not entitled to recover UM benefits because he was not "occupying" the ambulance when the accident occurred.

This court answered the Ninth Circuit's certified question in the negative, reasoning as follows:

> We begin our analysis of the problem by recognizing that both the no-fault and uninsured motorist statutes have as their purpose the protection of *users of motor vehicles* from bodily injury, sickness, or disease, including death, resulting from motor vehicle accidents. *See* HRS §§ 431–

---

**16.** At the time, HRS § 431–448 (1976) provided in relevant part:

> **Automobile liability; coverage for damage by uninsured or underinsured motor vehicle.** No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle, shall be delivered, issued for delivery or renewed in this State, with respect to any motor vehicle registered or principally garaged in this State, unless coverage is provided therein or supplemental thereto ... for bodily injury or death ... for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom, provided, however, that

the coverage required under this section shall not be applicable where any insured named in the policy shall reject the coverage in writing. (Bold in original and underscoring added.)

**17.** HRS § 431:10C–103(13) (1987 Spec. Pamphlet) provides:

> Operation, maintenance or use with respect to a motor vehicle includes occupying, entering into and alighting from it, but does not include:

> (A) Conduct in the course of loading or unloading the vehicle, unless the accidental harm occurs in the immediate proximity of the vehicle; and

> (B) Conduct within the course of a business of repairing, servicing, or otherwise maintaining vehicles, unless the conduct occurs outside the premises of such business.

448,[18] 294–1,[19] 294–2(1).[20] Furthermore, we recognize that the legislature intended the phrase "operation, maintenance or use" in HRS Chapter 294 to be a term of art which when used throughout the chapter means accidents resulting from activities prescribed "in the immediate proximity of the vehicle." HRS § 294–2(12);[21] Conf. Comm.Rep. No 28, in 1974 House Journal, at 864, 866.

To recognize [the insurer's] position would require us to acknowledge that the policy provision can be paramount over the statutory provision when a conflict exists. We have in the past voided such a policy provision where it conflicted with the statute. Therefore, we hold that the ... policy restriction is in conflict with the statute and is void.

. . . .

For the reasons stated, on the facts of this case, Olson has uninsured motorist coverage within the ILS insurance policy and HRS § 431–448.

*Olson,* 69 Haw. at 563–65, 751 P.2d at 669 (citations omitted and emphasis added).

Although we agree with this court's holding in *Olson* that auto policy language purporting to restrict UM coverage for non-named insureds and non-family members to other persons "occupying a covered auto" is void, we nevertheless believe that the *Olson* analysis is both inaccurate and unduly restrictive for two reasons.

■ First, contrary to this court's statement in *Olson,* the purpose underlying the Hawai'i UM statutes is *not* limited to the protection of "users of motor vehicles." On its face, HRS § 431–448 (now HRS § 431:10C–301(b)) mandated that auto policies extend UM coverage for the protection of *all* insured "persons ... who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury ..., including death, resulting therefrom[.]" *Cf. Palisbo, supra; Morgan, supra.* As noted above, the relevant legislative history is in accord. *See supra* note 6. Accordingly, the Hawai'i UM statutes mandate that coverage extend to "injury received as a *pedestrian*" where "some connection with the insured vehicle is shown." 8C Appleman § 5092.35, at 381 (emphasis added).

■ Second, and of particular significance, we believe that the *Olson* court simply misread Hse.Stand.Comm.Rep. No. 28, in 1974 House Journal, at 864, 866, when it concluded that the phrase "operation, maintenance or use," now appearing in HRS § 431:10C–103(13), *see supra* note 17 and accompanying text, was "a term of art which when used throughout the [Motor Vehicle Insurance] chapter means accidents resulting from activities prescribed 'in the immediate proximity of the [insured] vehicle.'" Set out in full, the legislative history on which the *Olson* court relied was the following:

**18.** *See supra* note 16.

**19.** HRS § 294–1 (1985) provided:

    **Purpose.** (a) The purpose of this chapter is to create a system of reparations for accidental harm and loss arising from *motor vehicle accidents,* to compensate these damages without regard to fault, and to limit tort liability for these accidents.
(Emphasis added.) HRS § 294–2(9) (1985) defined "motor vehicle accident" to mean "an accident arising out of the operation, maintenance, or use of *a motor vehicle,* including an object drawn or propelled by a motor vehicle." (Emphasis added.)
    HRS ch. 294, the Motor Vehicle Accident Reparations Act, was repealed in its entirety in 1987 and replaced by HRS ch. 431. Act 347, §§ 1 and 2, 1987 Haw.Sess.Laws 1–342. HRS § 294–2(9)

became HRS § 431:10C–103(9). *See supra* note 3.

**20.** HRS § 294–2(1) (1985) defined "accidental harm" to mean "bodily injury, death, sickness, or disease caused by a motor vehicle accident to a person." Following its repeal in 1987, *see supra* note 19, the definition was recodified as HRS § 431:10C–103(1). *See supra* note 3.

**21.** HRS § 294–2(12) (1985) provided that "'operation, maintenance, or use' when used with respect to *a* motor vehicle includes occupying, entering into and alighting from it but does not include *conduct in the course of loading or unloading the vehicle unless the accidental harm occurs in the immediate proximity of the vehicle....*" (Emphasis added.) Following its repeal, *see supra* note 16, the provision was recodified as HRS § 431:10C–103(13). *See supra* note 17.

(5) Definition: "Operation, maintenance, or use[.]"

In view of the [insurance] industry's objection to the definition of this phrase in the Act, your Committee has redefined it with particular reference to *the inclusion or exclusion of loading or unloading a vehicle.*

The Act included, *as no-fault damage,* all losses incurred *during loading and unloading an insured vehicle.* The industry recommended the exclusion of all such losses, requiring instead that a victim must be "occupying, entering", or "alighting from" a vehicle at the time of loss to be covered.

The industry, in testimony, cited the costly danger of having claims made for *injuries sustained during loading operations* which, in fact, were far removed from the parked, but insured, vehicle.

Your Committee has, therefore, sought to limit *this threat,* and simultaneously to provide coverage for losses commonly associated with the use or maintenance of a vehicle. By using a territorial criteria [sic] for this measure, we believe we have attained a moderate and moderating resolution. By requiring that an *injury during loading,* to be covered, must occur "in the immediate proximity of the vehicle" we have included *under no-fault coverage* such common one person accidents as the following:

(a) The mother-driver who turns an ankle while lifting an infant from a back seat of her parked car.

(b) The driver injured while hoisting a spare tire out of a modern, but impossible, trunk, preparatory to changing a flat.

Hse.Stand.Comm.Rep. No 28, in 1974 House Journal, at 866 (emphasis added).

Two things are apparent from the foregoing legislative history: (1) in crafting the definition of "operation, maintenance or use with respect to a motor vehicle," the legislature was responding to concerns expressed by the insurance industry regarding "loading and unloading a vehicle" when "injuries sustained during loading operations ... were far removed from the parked, but insured, vehicle"; and (2) the insurance industry's concerns were limited to the context of *no-fault insurance coverage.* Therefore, it is doubtful whether the phrase "in the immediate proximity of the vehicle" has any application to UM coverage at all; in any event, by the plain language of HRS § 431:10C–103(13), it is clearly limited to the context of conduct "in the course of loading or unloading the vehicle[.]" [22]

The non-applicability of "the immediate proximity of the vehicle" to the issue of Dawes's right to UM benefits highlights the irrelevance, under Hawai'i law, of such formulations as the *Rau* test in determining the right of persons other than named insureds and their family members, who have been passengers in an insured vehicle but are injured by uninsured motorists while pedestrians, to UM coverage. As we have noted, the critical element with respect to such claimants is a sufficient "connection with the insured vehicle." 8C Appleman § 5092.35, at 381.

Accordingly, we believe that the "chain of events" test, as articulated by the Oklahoma Supreme Court, is the most "appropriate" for deciding whether claimants in Dawes's position are entitled to UM benefits. *See Safeco Ins. Co. of America v. Sanders,* 803 P.2d 688, 691 (Okla.1990). Specifically, Dawes is entitled to UM benefits if Bockhorn's occupancy of Shimp's insured vehicle "started the chain of events which resulted in [Bockhorn's injury[.]" *Id.*[23]

**22.** The dissent opines that "an immediate physical proximity requirement is implicit in HRS § 431:10C–103(13)" and that, therefore, "the addition of an explicit limitation would have been superfluous and redundant." Dissenting opinion at 138, 883 P.2d at 59. What the dissent overlooks is that "the immediate proximity of the vehicle" is *already* embedded as "an explicit limitation" in HRS § 431:10C–103(13)(A). *See supra* note 17. If the dissent were correct that the

requirement is implicit in the *entirety* of HRS § 431:10C–103(13), then the language of subsection HRS § 431:10C–103(13)(A) would be "superfluous and redundant."

**23.** Contrary to the suggestion at 141, 883 P.2d at 62 of the dissenting opinion, "the outcome-dispositive issue" in the present case is *not* "whether the *claimant* [*i.e.,* Bockhorn] was engaged in

The *Safeco* "chain of events" test is amenable to the formulation of a new rule, which we now adopt as the law of this state: For purposes of entitlement to UM benefits, (1) if a person was a passenger in an insured vehicle being operated by a named insured or a named insured's family member, (2) during the chain of events resulting in injury to the person caused by an accident involving an uninsured motor vehicle, (3) then the person is a "covered person" at the time of his or her injury to the same extent as the named insured or the named insured's family members would be entitled to receive UM benefits under the applicable UM policy.[24]

As established in section III.A. of this opinion, it is uncontroverted that: (1) Bockhorn was a passenger in the insured vehicle; (2) the insured vehicle was being operated by Shimp, a "family member" of the named insured; (3) the insured vehicle broke down; (4) as a result of the breakdown, the occupants of the insured vehicle, including Bockhorn, exited and proceeded on foot to the Kona airport in order to obtain alternative transportation and repair assistance; and (5) en route to the group's destination, Bockhorn sustained fatal injuries as a result of the operation of an uninsured vehicle by an uninsured motorist. Accordingly, we hold as a matter of law that Bockhorn was a "covered person" within the meaning of the UM provisions of the FICH auto policy and that Dawes is entitled to UM benefits thereunder. It therefore follows that the circuit court erred in granting summary judgment in FICH's favor.

## IV. *CONCLUSION*

Based on the foregoing analysis, we reverse the circuit court's order granting summary judgment in favor of FICH and against Dawes and remand with instructions to enter summary judgment in favor of Dawes and against FICH.

MOON, Chief Justice, dissenting, in which HEEN, Justice, joins.

I agree with the majority's preservation of our recognition in *National Union Fire Insurance Co. v. Olson,* 69 Haw. 559, 751 P.2d 666 (1988), that "insurance policies with uninsured motorist provisions which purport to restrict the applicability of uninsured motorist statutes are void." *Id.* at 564, 751 P.2d at 669. I also agree that, pursuant to *Olson,* the provision of the policy at issue, which limits coverage to other non-named insured, non-family members who are "occupying" the insured vehicle, is void, and that the language of Hawai'i Revised Statutes (HRS) § 431:10–213 (1987 Spec. Pamphlet), applicable at the time of the accident, controls. However, I believe the majority's analysis runs afoul of two fundamental tenets of statutory construction and imprudently adopts an overly broad rule that will lead to inequitable and undesirable results; therefore, I respectfully dissent.

### I.

The insurance policy in issue affords UM coverage to "covered persons." "Covered person" is defined in relevant part as either (1) the named insured or any family member, or (2) "[a]ny other person occupying [the] covered auto."[1] As she is neither the named insured nor a family member of the named insured, the decedent Bockhorn's only possi-

---

'use' of a vehicle at the time of her injury[.]" (Emphasis in original.) *See supra* notes 8 and 10. Both *Safeco* and the present case involve the use of an uninsured vehicle by uninsured motorists.

**24.** We take issue with the dissent's claim that the rule we announce today "affords virtually limitless coverage once a claimant has occupied an insured vehicle." Dissenting opinion at 143, 883 P.2d at 64. In most cases, the question of causation—that is, whether the claimant was a passenger in an insured vehicle during the chain of events resulting in injury to the claimant caused by an accident involving an uninsured motor

vehicle—will present a genuine issue of material fact. The hypotheticals posed at 143–144, 883 P.2d at 64–65 of the dissenting opinion represent some interesting examples. Indeed, under some of them, a claimant may not be entitled to UM coverage as a matter of law. In any event, the present parties agreed that the matter before us was ripe for summary judgment. *See supra* at 6.

**1.** Most UM policies across the nation employ this categorical scheme to define coverage. *See, e.g.,* 1 A. Widiss, *Uninsured and Underinsured Motorist Insurance,* § 4.1, at 59 (2d ed. 1992) [hereinafter, Widiss] (referencing 1966 Standard Form, Part II: Persons Insured).

ble entitlement to coverage under the policy is pursuant to the second category. However, at the time of the accident, the law required that

> [n]o automobile liability or motor vehicle liability policy insuring against ... *death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle* shall be delivered ... *unless the policy provides coverage for the protection of the persons insured who are legally entitled to recover damages from owners or operators of uninsured motor vehicles....*

HRS § 431:10–213 (emphasis added). Because the policy at issue extends coverage only to those "occupying" the covered auto, it is more restrictive than, and therefore repugnant to, the scope of coverage required by HRS § 431:10–213; thus, the language of the statute must control. *Olson*, 69 Haw. at 564, 751 P.2d at 669. Consequently, the central inquiry governing Bockhorn's entitlement to coverage changes from whether Bockhorn was "occupying" the covered vehicle at the time of her death to whether her death arose out of the "ownership, maintenance or use" of the insured vehicle.

The majority contends that HRS § 431:10–213 does not require a claimant to be engaged in "ownership, maintenance or use" of the insured vehicle at the time of his or her accident to be covered and makes much of the presence of the terms "ownership, maintenance or use" in HRS § 431:10C–301(b)(1) and (2) (1987 Spec. Pamphlet), which addresses liability coverage, and the absence of said terms in subsection (3), which addresses UM coverage. The majority therefore suggests that the terms apply to the " 'owner[ ] or operator[ ] of [the] uninsured motor vehicle[ ]' causing injury and *not* that of the insured or 'covered' person claiming entitlement to UM benefits." Majority opinion at 129 n. 8, 883 P.2d at 50 (emphasis in original).

In order to effectuate the legislative intent underlying UM coverage and to avoid contrary or inconsistent requirements, HRS §§ 431:10–213 and 431:10C–301(b)(3), both of which existed at the time of the accident in the present case, must be read *in pari mate-*

ria with each other. *See, e.g.,* HRS § 1–16 ("Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another."); *State v. Kumukau,* 71 Haw. 218, 224, 787 P.2d 682, 686 (1990) (recognizing same); *Franks v. City & County of Honolulu,* 74 Haw. 328, 335, 843 P.2d 668, 671 (1993) (court must read statutory provisions in the context of the entire statute and construe it in a manner consistent with its purpose).

As previously noted, HRS § 431:10–213 provides in relevant part:

> *[n]o automobile* liability or motor vehicle liability *policy* insuring against ... death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle *shall be delivered ... unless the policy provides coverage for the protection of the persons insured who are legally entitled to recover damages from owners or operators of uninsured motor vehicles....*

*Id.* (emphasis added).

HRS § 431:10C–301(b)(3) provides:

> With respect to any motor vehicle registered or principally garaged in this State, liability coverage provided therein or supplemental thereto, in limits for bodily injury or death set forth in section 287–7, under provisions filed with and approved by the commissioner, for the protection of person insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom; *provided, however, that the coverage required under this section shall not be applicable where any insured named in the policy shall reject the coverage in writing.*

*Id.* (emphasis added).

As phrased in isolation, section 431:10–213 *requires* that every automobile liability or motor vehicle liability insurance policy include UM coverage. In other words, section 431:10–213, standing alone, mandates the inclusion of UM coverage in every motor vehicle insurance policy, much like liability and

property damage insurance. Section 431:10C–301(b)(3), on the other hand, allows the insured to reject the coverage in writing. Thus, when read separately, the two provisions appear to compel different requirements. However, when we examine the original UM statute and its legislative history, it becomes patently clear that in order to effectuate the legislative purpose of the UM statute, both sections 431:10–213 and 431:10C–301(b)(3) must be read together.

Both sections have their genesis in a common provision, the original UM statute, HRS § 431–448, which provided in relevant part:

**Automobile liability; coverage for damage by uninsured or underinsured motor vehicle.** (a) No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle, shall be delivered, issued for delivery, or renewed in this State, with respect to any motor vehicle registered or principally garaged in this State, unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death set forth in section 287–7, under provisions filed with and approved by the insurance commissioner, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom, provided that the coverage required under this section shall not apply where any insured named in the policy shall reject the coverage in writing.

The following relevant legislative history of section 431–448 clearly indicates that the legislative intent was to create a statutory scheme premised on the insurer's mandatory offer, and not mandatory inclusion, of UM coverage:

The purpose of this bill is to promote protection through *voluntary* insurance, for persons who are injured by uninsured motorists who cannot pay for personal injuries caused by motor vehicle accidents. The bill would require all companies writing policies insuring against liability for personal injuries and property damages to *offer* to their clients "uninsured motorist protection."

Hse.Stand.Comm.Rep. No. 194, in 1965 House Journal at 582 (emphasis added). Therefore, section 431:10–213 must be read together with section 431:10C–301(b)(3) so as to effectuate this intent. Any other interpretation unacceptably would render section 431:10–213 superfluous. *See Franks,* 74 Haw. at 339, 843 P.2d at 673 (Courts are bound, if rational and practicable, to give effect to all parts of a statute and no clause, sentence or word shall be construed as superfluous, void or insignificant if construction can be legitimately found which will give force to and preserve all words of the statute.); *see also Mollena v. Fireman's Fund Ins. Co. of Hawaii,* 72 Haw. 314, 324, 816 P.2d 968, 973 (1991) (construing subsections (a) and (b) of HRS § 431–448 so as to prevent rendering section meaningless); *State Farm Mut. Auto. Ins. Co. v. Robinol,* 699 F.Supp. 819, 822 (D.Haw.1988) (requirement under HRS § 431–448(a) that offers for coverage must be made when policy "shall be delivered, issued for delivery, or renewed" applied to HRS § 431–448(b)).

Therefore, the "ownership, maintenance or use" clause clearly applies to HRS § 431:10C–301(b)(3), notwithstanding the absence of those terms in that subsection, and the scope of coverage mandated by the statute must be interpreted accordingly. The issue thus is: to whom do the terms apply, the uninsured motorist or the claimant?

Section 431:10–213, read in conjunction with section 431:10C–301(b)(3), requires the insurer to offer UM coverage in all motor vehicle or automobile *liability* policies which "insure against loss for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle," and UM coverage must be provided "for the protection of the persons insured." HRS § 431:10–213(a). In accordance with this statutory provision, "the persons who *must* be insured by the uninsured motorist insurance are those who comprise the class described by the phrase 'for the protection of persons insured thereunder' and therefore

the terms of the liability coverage are to be employed to determine who is insured for purposes of the uninsured motorist coverage." Widiss, *supra,* § 2.8 at 38 (emphasis added). Professor Widiss concludes:

> [UM] [c]overage for persons who are involved with the "maintenance" or "use" of an insured vehicle arguably is required by the statutory mandates which have been adopted throughout the nation.... Therefore, if a coverage issue arises about the *scope of protection* when the insurance policy is subject to such a statutory mandate, there is an additional—and very compelling—justification for the view that coverage must be afforded for anyone who is engaged in the maintenance or use *of an insured vehicle*—that is, anyone who is engaged in the maintenance or use is an insured because such persons clearly are afforded liability coverage without regard to whether they are defined as "insureds" in the coverage terms for the uninsured motorist insurance.

*Id.* (emphasis added). "Operation, maintenance or use," therefore, applies to the claimant.

As Professor Widiss also makes clear, the argument for imposition of the statutory scope of coverage in lieu of the scope of coverage as defined by the policy terms is that the terms utilized to define the scope of required coverage in the statute are broader than the terms used to define the scope of coverage within the policy. In other words, as noted above, "ownership, maintenance or use" sets out a broader scope of coverage than "occupying." Bockhorn's very argument for relief from the "occupancy" restriction of the policy thus necessarily rests on the fact that "operation, maintenance or use," as set forth in the statute, both applies to her and is comparatively more expansive than "occupancy." She is, however, also bound by its concomitant restrictions.

In our interpretation of "operation, maintenance or use," we also read it *in pari materia* with the current HRS § 431:10C–103(13),[2] which defines "operation, maintenance or use" as "occupying, entering into or alighting from" a motor vehicle. *See Matter of Hawaiian Telephone Co.,* 61 Haw. 572, 579, 608 P.2d 383, 388 (1980) ("The legislature has a broad power to define terms for a particular legislative purpose, and the courts, as a general rule of construction, are bound to follow legislative definitions of terms rather than commonly accepted dictionary, judicial or scientific definitions.").

Thus, the issue in this case is one of pure statutory construction. Specifically, the question in the present case is whether, at the time of the accident, Bockhorn was engaged in the "use" of the disabled vehicle as that term is utilized in HRS § 431:10–213 and defined in HRS § 431:10C–103(13).

## II.

This court has often noted that, when construing a statute, "our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Franks,* 74 Haw. at 334, 843 P.2d at 671 (internal quotation marks omitted) (citations omitted). The plain meaning of the terms utilized in the definition sets up a logical construct contemplating a zone of physical proximity to the insured vehicle. To constitute "operation, maintenance or use," one must be, to quote the language of the majority, somehow "connected" to the vehicle. Majority opinion at 126–127, 883 P.2d at 47–48. This "connection," as statutorily established by the words "occupying," "entering into," and "alighting from," undeniably contains a physical proximity element.[3] To adopt an interpretive test that ignores this

---

2. HRS § 431:10C–103(13) provides in pertinent part:

> Operation, maintenance or use with respect to a motor vehicle includes occupying, entering into and alighting from it, but does not include:
> (A) Conduct in the course of loading or unloading the vehicle, unless the accidental

> harm occurs in the immediate proximity of the vehicle[.]

HRS § 431:10C–103(13) (1987 Spec. Pamphlet).

3. *Webster's New International Dictionary* (3d ed. 1967) [hereinafter, *Webster's* ] defines "occupy" in relevant part as "to fill up (a place or extent) ... to take up residence in ... to hold possession of." *Webster's, supra,* at 1560. "Occupy" also

characteristic, violates the first principle of statutory interpretation as noted in *Franks*, and moreover, simply offends common sense.

Review of the legislative history reveals that the legislative intent is in accord with the plain meaning of the terms utilized in the definition. The majority, I believe, unnecessarily parses the language of the applicable legislative history with surgical precision to conclude that the explicit "immediate proximity" limitation of HRS § 431:10C–103(13)(A) [4] should be restricted to "conduct in the course of loading or unloading the vehicle." By so concluding, the majority overrules *Olson* to the extent it holds otherwise and effectively disregards the fact that the legislature recognized that a claimant's physical proximity to an insured vehicle is both a relevant and logical characteristic upon which to base the boundaries of coverage. In *Olson*, the court concluded that "the legislature intended the phrase 'operation, maintenance or use' in HRS Chapter 294 to be a term of art which when used throughout the chapter means accidents resulting from activities prescribed 'in the *immediate proximity* of the vehicle.'" 69 Haw. at 563, 751 P.2d at 669 (emphasis added). Although the court may have taken the phrase "in the immediate proximity of the vehicle" out of the "loading or unloading" context, it correctly recognized the legislative intent to utilize a claimant's physical proximity as a limiting principle to balance the competing concerns of coverage and cost containment, especially in light of the plain meaning of the terms in the definition.

The utility of the legislative history in our analysis of the definition of "use" lies not as much in the specifics of the language, but rather in what it reveals about the concerns that were before it when the statute was being worded, that is, the insurance industry's uneasiness with the prospect of being statutorily required to cover vehicle-related injuries that occur physically distant from the vehicle itself. In earlier drafts of the statute, loading and unloading activities were included, without limitation, in the definition of "operation, maintenance or use." Hse. Stand.Comm.Rep. No. 28, in 1974 House Journal at 866; *see* Majority opinion at 131–132, 883 P.2d at 52–53. Uneasy with the language, the insurance industry recommended the exclusion of all such losses, that is, while loading and unloading, "requiring instead that a victim must be 'occupying, entering', or 'alighting from' a vehicle at the time of loss [in order] to be covered." Hse. Stand.Comm.Rep. No. 28, in 1974 House Journal at 866. Specifically, the industry voiced concern over the "costly danger of having claims made for injuries sustained during loading operations which, in fact, *were far removed from the parked, but insured, vehicle." Id.* (emphasis added). In other words, insurers were concerned about injuries arising out of situations where a victim lacks a proximate physical relationship to the insured vehicle. The industry, however, was *not* similarly concerned with such a lack of physical proximity in the balance of the definition and was content to rely on a definition that confined "operation, maintenance or use" to "occupying, entering into or alighting from" a motor vehicle. Consistent with the relationship of physical proximity inherent in the plain meaning of the terms, the industry was not concerned with the inclusion of an explicit "immediate proximity" limitation in the definition of "operation, maintenance, or use," because the definition, in and of itself, clearly encompassed that requirement.

Admittedly, the discussion memorialized in the committee report, *see* Majority opinion at 131–132, 883 P.2d at 52–53, arose out of a discussion of no-fault coverage and "loading

means "to take or fill up (time, space)." *The Random House Dictionary of the English Language* 920 (Rev. ed. 1979) [hereinafter, *Random House* ].

"Enter" is defined in relevant part as "to go or come into a material place; make a physical entrance or penetration." *Webster's, supra,* at 756; "to come or go into; to penetrate or pierce: the bullet entered the bone.; to put in or insert:

to enter a wedge under a door." *Random House, supra,* at 441.

"Alight" is defined in relevant part as "to spring down, get down, or descend (as from horseback or a vehicle); dismount." *Webster's, supra,* at 53; "to dismount from a horse, descend from a vehicle, etc." *Random House, supra,* at 34.

4. *See supra* note 2.

and unloading"; however, the specific concern before the legislature clearly indicated an awareness regarding the effects of the absence of a physical proximity requirement and the costs of coverage.[5] A fair reading of the legislative history supports the conclusion that, in light of the plain meaning of the terms, an immediate physical proximity requirement is implicit in HRS § 431:10C–103(13); the addition of an explicit limitation would have been *superfluous and redundant*.[6] Thus, although its analysis may have been slightly flawed, I submit that the court in *Olson,* by adopting the phrase "in the immediate proximity of the vehicle" from the loading and unloading context, was nevertheless correct in interpreting the legislative intent and, accordingly, reached the correct result.

It is also important to note that, to the extent the majority overrules *Olson,* it also overrules *Colonial Penn Insurance Co. v. First Insurance Co. of Hawai'i,* 71 Haw. 42, 780 P.2d 1112 (1989) to the same extent. In *Colonial Penn,* this court reaffirmed *Olson*'s recognition that the "immediate proximity" limitation applied generally to the phrase "operation, maintenance, or use" wherever it was used in the insurance code, and further applied it to the insurance policy phrase "vehicle occupied by the injured person." *Id.* at 44, 780 P.2d at 1114.

Moreover, to support its position in derogation of *Olson,* the majority states that "the purpose underlying the Hawai'i UM statutes is *not* limited to the protection of 'users of motor vehicles[,]'" Majority opinion at 131, 883 P.2d at 52 (emphasis in original), and cites to the language of the former HRS § 431–448 (1976) (now HRS § 431:10C–301(b)), asserting that it "mandated that auto policies extend UM coverage for the protection of *all* insured 'persons ... who are legally entitled to recover damages from

owners and operators of uninsured motor vehicles[.]'" Majority opinion at 131, 883 P.2d at 52 (emphasis in original). This argument obfuscates the issue because it simply restates the obvious, that is, that all insured persons are covered, and begs the very question at issue in this case. I submit that no one would disagree that if a person exercised his or her option to purchase UM protection and an insured under the policy was subsequently injured by an uninsured motorist and was legally entitled to recover damages, that person should be covered. The issue here, however, is who *is* insured.

### III.

We have often noted that "a departure from a literal construction of a statute is justified when such construction would produce an absurd ... result and the literal construct in the particular action is clearly inconsistent with the purposes and policies of the act." *Richardson v. City & County of Honolulu,* 76 Hawai'i 46, 60, 868 P.2d 1193, 1207 (1994) (quoting *Franks,* 74 Haw. at 341, 843 P.2d at 674). The majority violates this principle, improperly departs from the plain meaning of the statute and the legislative history, and adopts a rule that will ironically produce the absurd results it allegedly attempts to avoid.

The "absurdity" ostensibly relied upon by the majority in justifying its departure from the physical or immediate proximity requirement of the statute is that, if Shimp, the driver of the insured vehicle, and Bockhorn, the passenger, were *both* struck by the uninsured motorist one mile down the road from the disabled vehicle, Shimp would be covered and Bockhorn would not, "although both had been *occupants* of the insured vehicle and both were identically situated with respect to

---

5. The insurers' concerns conveyed to the legislature were well-founded because the scope of coverage for a claimant, deriving entitlement to coverage by virtue of "operation, maintenance, or use" is obviously related to the claimant's physical proximity to the insured vehicle. A potential claimant clearly encounters a greater number of risks of bodily injury the farther he or she ventures from the physical proximity of the insured vehicle. Failing to recognize a limitation, based on a claimant's physical proximity to the vehicle, would undoubtedly require an insurer to cover more risks and to spread the attendant costs of such coverage by increasing its premium schedules for all insureds accordingly.

6. In light of the majority's conclusions, and for prospective purposes, an explicit pronouncement by the legislature regarding the physical proximity limitation inherent in HRS § 431:10C–103(13) would be prudent.

the uninsured Honda Accord." Majority opinion at 127, 883 P.2d at 48 (emphasis added). Such a result cannot be deemed an absurdity and, with all due respect, the majority's conclusion that the result is absurd is simply wrong.

Under the majority's hypothetical, Shimp and Bockhorn were indeed both occupants of the vehicle at one time, and both were struck by the same vehicle. However, in the context of *insurance coverage*, the two are worlds apart. As Professor Widiss notes, "the conditions under which the coverage is provided for individuals in each of these three groups [7] or classes of insureds [as set out by the policy] is distinctly different. Therefore, when confronted with disputes about whether a claimant is an insured, *it is essential to begin the analysis upon which the claimant seeks to be covered as an insured.*" Widiss, *supra*, § 4.1, at 59 (emphasis added). Shimp derives his entitlement to coverage based on his status as a family member of a named insured, who entered into a contract of insurance with the insurer and paid premiums in exchange for coverage, not because he was an occupant of the vehicle. As a "family member," Shimp's coverage under the policy is relatively comprehensive. As Professor Widiss notes, "'Clause (a)' insureds [i.e. named insureds and "family members"] are protected when they are operating or are passengers in a motor vehicle, as well as when they are engaged in any other activity such as walking, riding a bicycle, driving a hay wagon, or even sitting on a front porch." Widiss, *supra*, § 4.2 at 60–61.[8] Bockhorn's entitlement to coverage, however, would arise only by virtue of her status as an occupant of the Shimp family's insured vehicle. This distinction is supported by the relevant legislative history, which provides:

> An insurance company offering uninsured motorist protection engages to pay to the insured, *spouse or minor children or either, resident in the named insured's household,* sums not to exceed the stated limits, for any uncollectible valid claim or unsatisfied judgment for damages resulting from bodily injury or death, resulting from the ownership, maintenance or use of an automobile.

Hse.Stand.Comm.Rep. No. 194, in 1965 House Journal at 582 (emphasis added). In interpreting this legislative history, we have previously noted:

> The avowed-purpose of the [UM] statute is to encourage self-protection against the financially irresponsible motorist through **voluntary insurance.** To make this realistically possible, it requires liability insurance companies to offer their clients this protection in at least the minimum amounts established by the financial responsibility law. The policy required under the financial responsibility law is for the protection of the public generally, while uninsured motorist insurance is for individuals who have the foresight to protect themselves against the financially irre-

---

7. According to Professor Widiss, uninsured motorist insurance generally provides coverage for three distinct groups or classes of persons:

    (a) The named insureds identified in the Declarations and, while residents of the same household, the spouse and relatives of the named insureds;

    (b) Any other person while occupying a covered or insured vehicle; and

    (c) Any person with respect to damages that person is entitled to recover because of bodily injury to which this coverage applies sustained by a person described in (a) or (b) above.

Widiss, *supra*, § 4.1 at 59.

8. The majority's cite to Couch aptly sets forth the rationale in distinguishing between Shimp and Bockhorn:

    [U]ninsured motorist coverage ... creates two classes of persons who can recover: on the one hand, the named insured, and while resident of the same household, the spouse of any such named insured, and relatives of either; and on the other, those who use, with the consent, express or implied of the named insured, the vehicle to which the policy applies and those who are guests in such vehicle.... [S]econd group persons are only covered when an accident takes place while they are occupying, operating or using the insured vehicle. This is to be contrasted with the fact that first group persons are not required to be associated with the insured auto in order for coverage to attach.... Coverage for the first of the classes listed above, but not for the second, extends to an injury suffered while a pedestrian.

Majority opinion at 124, 883 P.2d at 46 (quoting 12A J. Couch, *Cyclopedia of Insurance Law* § 45:635, at 130–32 (R. Anderson and M. Rhodes 2d ed. 1981) (footnotes omitted)).

sponsible motorist. The statute was clearly designed to enable the purchaser of the latter type of insurance to assure himself and the members of his household of not less than the minimum protection provided for the general public in the financial responsibility law. The uninsured motorist policy is personal to the insured. This is what he bargained for, and one which he was encouraged to purchase by the legislature.

*Palisbo v. Hawaiian Ins. & Guar. Co., Ltd.*, 57 Haw. 10, 15, 547 P.2d 1350, 1354 (1976) (underscoring added) (bold in original). The legislature made explicit its intent to accord full UM protection to a named insured and his or her family. Nowhere is there voiced a similar intent to accord coextensive coverage to passengers of insured vehicles, let alone former passengers, long since separated from the insured vehicle by time, space, and state of mind.

In other words, Shimp and his family are covered for bodily injury or death under their UM policy as pedestrians *because they bargained and paid for the coverage.* Here, the patent, sensible, and ultimately fair distinction as recognized by the legislature between Shimp and Bockhorn is that Bockhorn never paid a single premium to the insurer; accordingly she is not entitled to the same *scope of coverage* as Shimp. The supposed "absurdity" as set forth by the majority is unfounded and cannot form the basis in which to depart from the intent of the legislature.

The majority contends that if this court were to recognize a physical proximity limitation on "use," *"neither* Shimp *nor* Bockhorn would be entitled to UM benefits." Majority opinion at 127–128 n. 12, 883 P.2d at 48–49. First, as noted above, the only provision of the policy in contravention of the statute, and thus in issue in the present case, is the provision limiting coverage to other non-named insured, non-family members who "occupy" the vehicle; coverage as to "family members," like Shimp, remains valid and is consistent with the legislative intent to offer coverage to those with the foresight to purchase insurance to protect both themselves and their families. Second, as Professor

Widiss notes, although the uninsured motorist insurance must protect all classes of persons who are protected by the liability coverage, "the uninsured motorist insurance may define insureds so as to provide coverage for persons who would not be covered by the associated liability insurance coverage." Widiss, *supra*, § 5.2 at 198.

## IV.

Further, I believe the majority unwisely relies on the "chain of events" test utilized by the Oklahoma Supreme Court in *Safeco Insurance Co. of America v. Sanders*, 803 P.2d 688 (Okla.1990), in fashioning its rule. *Safeco* addresses a different outcome-dispositive issue. In *Safeco*, claimants Laura Lee Sanders and Michael Houghton were sitting in Sanders' father's automobile when they were subdued by Scott Allen Hain and Robert Wayne Lambert. *Id.* at 689. After forcing Sanders to drive for a short distance, Hain and Lambert directed her to stop, forced Houghton out of the car, took his money and his keys, tied him up, and locked him in the trunk of the vehicle. *Id.* Either Hain or Lambert then drove the car for a short distance, stopped, and locked Sanders in the trunk with Houghton. *Id.* Hain or Lambert drove the vehicle back to the site of the abduction and then, with Hain driving Sanders' vehicle and Lambert driving Houghton's truck, drove to an isolated area. *Id.* With Sanders and Houghton locked in the trunk of Sanders' car, Hain and Lambert cut the vehicle's fuel line, set the fuel afire, and burned the car. *Id.* Hain and Lambert then left the scene in Houghton's truck; Sanders and Houghton died as a result of thermal burns and smoke inhalation. *Id.*

The Sanders' vehicle was insured under an automobile policy issued by Safeco, which included UM coverage. The personal representatives of the estates of Sanders and Houghton filed claims for UM benefits. Safeco denied the claims and commenced a declaratory judgment action in the United States District Court for the Northern District of Oklahoma, which in turn, certified

four questions to the Oklahoma Supreme Court.[9]

Unlike the present case, where the outcome-dispositive issue is whether the *claimant* was engaged in "use" of a vehicle at the time of her injury, the outcome-dispositive issue in *Safeco* was whether Hain and Lambert, as *uninsured motorists*, were engaged in the use of an *uninsured vehicle*. The *Safeco* court explained:

> The requirement in subsection B of § 3636 [10] that the insured be legally entitled to recover damages from the owner or operator of an uninsured motor vehicle implies an intent that there be a connection between the motoring or transportation use (use related to the inherent nature of a motor vehicle) *by an uninsured motorist* and the injury to the insured. Therefore, a two-prong test is necessary to determine whether an injury is within the UM coverage contemplated by § 3636: 1) is a use of the vehicle connected to the injury; and 2) is that use related to the transportation nature of the vehicle. If the injury is within the mandate of § 3636, then it is causally connected to the use of a motor vehicle.

*Id.* at 692 (emphasis added). The *Safeco* court was thus primarily concerned with Oklahoma's statutory language "legally entitled to recover damages from the owner or operator of an uninsured motor vehicle" and how that statutory requirement applied to the uninsured motorists, Hain and Lambert.[11]

Furthermore, in concluding that Sanders and Houghton were engaged in "use" at the time they were killed in the trunk of the insured vehicle, the *Safeco* court specifically held that "if the facts establish that a motor vehicle or any part of the motor vehicle is the *dangerous instrumentality* which starts the chain of events leading to the injury, the injury arises out of the use of the motor vehicle, as contemplated by 36 O.S.1981, § 3636." *Id.* at 692 (emphasis added). Phrased in its entirety, it is clear that the test arises from a different context and addresses an entirely distinct problem. On its face, the rule simply does not apply to the present situation because neither the Shimp vehicle nor any part of it could be characterized as a "dangerous instrumentality which start[ed] the chain of events leading to [Bockhorn's] injury." *Id.*

In addition, consistent with the primary question in the case, the *Safeco* court ultimately ruled in favor of the insurer based on the third certified question, holding that

**9.** The four certified questions read as follows:

> 1. Does the murder of [the decedents] when they were murdered by being burned to death in the trunk of the automobile in question "arise out of the ... use of the motor vehicle" as contemplated by 36 O.S. § 3636?
> 2. If the deaths arose out of the use of a motor vehicle, was there a causal connection between the use of the vehicle and the murders?
> 3. If the causal connection existed, do the acts of [the murderers] after the car was parked, constitute acts of independent significance to sever any causal link?
> 4. Were [the murderers] "operators of (an) uninsured motor vehicle" when they set the vehicle on fire and murdered [the decedents]?

*Safeco*, 803 P.2d at 690.

**10.** The Oklahoma statute relating to UM coverage, 36 Oklahoma Statutes 1981 § 3636 provides in pertinent part:

> (A) No policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person *arising out of the ownership, maintenance or use of a motor vehicle* shall be issued, delivered, renewed, or extended in this state with respect to a motor vehicle registered in this or principally garaged in this state unless the policy includes the coverage described in subsection (B) of this section.
> (B) The policy referred to in subsection (A) of this section shall provide coverage therein or supplemental thereto for the protection of persons insured thereunder who are *legally entitled to recover damages from owners or operators of uninsured motor vehicles* or hit-and-run motor vehicles because of bodily injury, sickness or disease, including death therefrom. Coverage shall not be less than the amounts or limits prescribed for bodily injury or death for a policy meeting the requirements of Section 7–204 of Title 47, Oklahoma Statutes, as the same may be hereafter amended....

36 O.S.1981 § 3636 (emphasis added).

**11.** The *Safeco* court also held that because Oklahoma law holds that a motor vehicle is uninsured when it is driven by an uninsured motorist, the vehicle listed in the Safeco policy became uninsured when it was operated by Hain and/or Lambert, who were uninsured, just before setting fire to the vehicle. 803 P.2d at 695–96.

"acts of an uninsured motorist which are not related to the transportation nature of a motor vehicle and which result in injury to the insured constitute acts of independent significance which sever the causal connection between the use of a motor vehicle and the injury." *Id.* at 694. The court noted:

> Under the facts certified to this Court, the acts of cutting the fuel line and igniting the fuel after the car was parked, which caused the car to burn, are so contrary to its [sic] transportation nature of the vehicle that, as a matter of law, these events are not related to its transportation nature and injury resulting therefrom is not within the UM coverage mandated by § 3636.

*Id.* at 695.

Because it turns on a completely different issue stemming from different statutory language, *Safeco* reasonably cannot be said to stand for the proposition that a claimant, one mile away from a disabled vehicle, is engaged in "use" of the disabled vehicle and, thus, forms an improper legal context from which to derive the rule in the present case.

Moreover, *Safeco* is factually distinguishable from the present case. Unlike the present case, the *Safeco* claimants were physically proximate to, and were clearly "occupying" the insured vehicle. As Sanders and Houghton were locked in the trunk of the insured vehicle, they were physically proximate to the vehicle.

Similarly, all of the cases relied upon by *Safeco*, which included *Olson*, also involve situations where the claimants were either in or within a reasonable physical proximity of the insured vehicles and are, thus, inapposite to the present case. In *Oklahoma Farm Bureau Mutual Insurance Co. v. Mouse*, 268 P.2d 886 (Okla.1954), the case relied upon by the *Safeco* court for the "chain of events" rule, the claimant (Mouse) was injured when he fell from a combine he was transporting after the combine's breather pipe became lodged in the top of a bridge, and he was directed to climb onto the combine to dislodge the pipe. *Id.* at 889. The court held that Mouse was engaged in "use" of the truck at the time of his injury and was thus entitled to liability insurance benefits, and also explicitly noted that, in considering whether the truck was the mechanism that caused Mouse's injury, "in all reported cases where the cause of the injury was something *physically attached to or immediately connected in some manner to the vehicle or its operation,* the injury resulted from the use of the vehicle[.]" *Id.* at 889.

In *Alabama Farm Bureau Mutual Casualty Insurance Co. v. Mitchell,* 373 So.2d 1129 (Ala.Civ.App.1979), the decedent insured's yard man beat and choked her, wrapped her in a blanket, placed her in the trunk of her insured vehicle, and ultimately abandoned the vehicle. She died from lack of food, water, and oxygen. The decedent's family sought coverage under their UM policy and was denied coverage because, among other reasons, the decedent was not engaged in "use" of the vehicle at the time she died. On appeal, the Alabama Civil Court of Appeals remanded the case, noting that "[w]hether [the decedent's] death resulted from the 'use' of the automobile is a factual matter to be decided by the trier of fact in the wrongful death action, not in [the] declaratory judgment action." *Id.* at 1135.

In *Gilbertson v. State Farm Mutual Automobile Insurance Co.,* 845 F.2d 245 (10th Cir.1988), two claimants were injured and one was killed when the tortfeasor dropped a fifty-one pound rock from a freeway overpass onto their car as it passed below. The claimants sought coverage under their UM policy. The Tenth Circuit of Appeals affirmed summary judgment for the insurer, noting "the real question in [the] case is one of causation," and held that "[the tortfeasor's] exiting the car, removing the rock from the car, carrying the rock to the edge of the overpass, balancing it on the ledge and then allowing it to fall, taken together, constituted an act of independent significance which broke the causal link between the use of the [tortfeasor's uninsured] car and the [claimants'] injuries." *Id.* at 248.

Finally, in *Casualty Reciprocal Exchange v. Waggoner Drilling Co.,* 340 P.2d 490 (Okla.1959), a case dealing with liability insurance, a drilling company contracted with a trucking company to dismantle, transport, and reassemble a drilling rig. The rig was

damaged during reassembly, and the drilling company sued the trucking company for the damage. The trucking company's liability insurer denied coverage, asserting, *inter alia*, that the accident did not result from an operation or use of the truck on the highway. *Id.* at 493. The court held that as the disassembly, loading, unloading, and reassembly of the oil rig constituted one continuous act of transportation, the operation or use of the vehicle had a "proximate and necessary connection with the operation and use of the vehicle upon the highway...." *Id.* at 495.

As demonstrated by the above discussion, *Safeco* addresses a very different coverage issue and arises from a very different factual context, and is not the case upon which to rely to craft a rule for the present case.

Finally, the majority gleans a "new" rule not only from a foreign legal context, but also imprudently excises the rule out of context from the case itself. By extracting only the expansive definition of "use" in *Safeco* and ignoring the accompanying analysis regarding the causal connection between the use of the vehicle and the murders, the majority adopts an excessively broad principle similar to a "but-for" test. The majority's proffered rule also completely ignores *a claimant's* status as a non-named, non-family member under the policy. Moreover, because "[t]here is hardly any activity in our society which is not preceded by the use of an automobile[,]" *Gilbertson*, 845 F.2d at 248, the "new" rule affords virtually limitless coverage once a claimant has occupied an insured vehicle.

Under the test as adopted by the majority, the coverage question would amount to a simple inquiry into whether the claimant was injured in the broad and unqualified subsequent "chain of events." In other words, if the injury was caused by an uninsured motorist *after* occupancy of an insured vehicle, the claimant is covered, regardless of time, physical distance, or, seemingly, even intervening events.

Most importantly, under the test as formulated by the majority, there apparently is no need to examine the cause of an otherwise uninsured passenger leaving the vehicle. Thus, whether the passenger leaves a vehicle because it breaks down or is simply parked, or because he or she was dropped off at some destination, according to the new rule, UM coverage continues to be extended to the former passenger for some undefined period of time or distance from the insured vehicle. Although the majority states that "the critical element [for UM coverage] with respect to [persons who have been passengers in an uninsured vehicle but are injured by uninsured motorists while pedestrians] is a sufficient 'connection with the insured vehicle[,]' " Majority opinion at 132, 883 P.2d at 53, and concludes that "as a matter of law ... there was a 'causal relation or connection between [Bockhorn's death] and the *use* of the insured vehicle,'" Majority opinion at 127, 883 P.2d at 48 (emphasis added), the test completely disregards the critical element of a causal connection between the use of the vehicle and the injury.

The majority's "new" rule will undoubtedly lead to absurd results. For example, assume the same facts as the present case, that is, a non-named insured, non-family member passenger is riding in an insured vehicle driven by a named insured or family member of a named insured and the vehicle breaks down. If the passenger then hitchhikes and receives a ride from a second insured vehicle and that vehicle is struck by an uninsured motorist which causes injury to the passenger, the passenger would potentially be covered under both vehicles' insurance because, under the majority's test, the incident would have occurred during the "chain of events" subsequent to the occupancy of the first insured vehicle. In the event the second vehicle was uninsured and was involved in a one-car accident, injury to the passenger would be covered by the first vehicle that was insured. The same result would achieve if the passenger hitchhikes and subsequently receives rides from multiple insured or uninsured vehicles which break down in turn before an accident with an uninsured vehicle. What if the disabled vehicle was a large van or bus? Under the majority's test, if all passengers then go their separate ways and each receives injuries caused by an uninsured motorist, all passengers would be covered under the UM policy applicable to the van, bus, or

its drivers, again regardless of time or physical distance. Taken further, in light of our decision in *Ganiron v. Hawai'i Insurance & Guaranty Association,* 69 Haw. 432, 744 P.2d 1210 (1987), where we held that an insured can recover under a UM policy for injuries inflicted upon him or her by a gunshot from an unidentified individual in an unidentified vehicle, any of the van or bus passengers, who sustain injuries as a result of a drive-by shooting while walking miles away from the insured vehicle, would be covered by the insurance applicable to the van or bus and thus entitled to UM benefits.

The majority states that the above-noted hypotheticals "represent some interesting examples," and that "[i]ndeed, under some of them, a claimant may not be entitled to UM coverage as a matter of law." Majority opinion at 132 n. 23, 883 P.2d at 53. The majority takes issue with the contention that their rule affords virtually limitless coverage once a claimant has occupied an insured vehicle, but is also suspiciously reluctant to explain which claimants in which hypotheticals would not be entitled to coverage and why. The majority's response that a claimant may not be entitled to UM coverage as a matter of law in "some" situations implies that the amorphous "chain of events" may be broken, but the majority refuses to shed any light on what could serve to break it, or even what holds "the chain's" links together. I would submit that as the test stands, unqualified and unchecked, the "chain" encompasses all accidents caused by an uninsured motorist after a claimant's occupancy of an insured vehicle and seemingly cannot be broken.

### V.

I believe these results do not comport with the legislative intent and are not in accord with the statutory scheme of providing insurance to the consumer "at the most reasonable and lowest cost," Sen.Stand.Comm.Rep. No. 689, in 1985 Senate Journal 1181, and surely could not have been anticipated, much

less intended, by the legislature when it defined the scope of "use" in the UM statute.

Accordingly, because any test purporting to effectuate the legislative intent underlying the plain meaning and legislative history of HRS §§ 431:10–213 and 431:10C–103(13) at the very least must incorporate a reasonable physical proximity limitation, and in light of the majority's admission that Bockhorn, as a matter of law, was not in a reasonable physical proximity to the insured vehicle,[12] I would affirm the trial court's grant of summary judgment in favor of FICH.

12. The majority states, "we do not believe, on the record before us, that any reasonable trier of fact could find Bockhorn was in a reasonably close geographic proximity to the insured vehicle at the time of the accident; accordingly, it is apparent as a matter of law that she was not." Majority opinion at 127, 883 P.2d at 48 (internal quotation marks omitted) (citations omitted).